**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.** 25-03116-MJ-D'ANGELO

**IN RE SEALED COMPLAINT**

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?  No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?  No

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:   */s/ Claire M. Horrell*
CLAIRE M. HORRELL
TRIAL ATTORNEY
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20530
Tel: (202) 285-5630
claire.horrell@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>IRAKLI NAKASHIDZE,<br>_____<br>_Defendant._ | )<br>)<br>)<br>)<br>)<br>)<br> Case No.  25-03116-MJ-D'ANGELO |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   March 7, April 3, and April 4, 2025   in the county of   Miami-Dade   in the   Southern   District of   Florida  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1957(a) | Money Laundering |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Orlando Buissereth, Special Agent, HHS-OIG
_Printed name and title_   OIG A1739

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by   Face Time

Date:   6/04/2025

_____
_Judge's signature_

City and state:   Miami, Florida

Honorable Ellen F. D'Angelo, United States Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Orlando Buissereth, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent with the U.S. Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), currently assigned to the HHS-OIG Miami Regional Office. I have been a Special Agent with HHS-OIG since November 2019. I have completed the Criminal Investigator Training Program course at the Federal Law Enforcement Training Center and Special Agent Basic Training program at HHS-OIG's National Training and Emergency Operations Branch. I also have a master's degree in accounting from Florida Atlantic University. As a Special Agent, I have conducted many fraud investigations, including investigations relating to money laundering, health care fraud, and wire fraud. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18 of the United States Code, including, but not limited to, offenses involving health care fraud, money laundering, and conspiracies to commit those offenses.

2.      This case is being investigated by HHS-OIG, the Federal Bureau of Investigation ("FBI"), and the Office of Personnel Management, Office of the Inspector General ("OPM-OIG").

3.      This Affidavit is submitted in support of a criminal complaint and arrest warrant. For the reasons set forth below, I respectfully submit that this affidavit contains probable cause to believe that, on or about the dates set forth below, in Miami-Dade County, in the Southern District of Florida, Irakli Nakashidze ("NAKASHIDZE") violated Title 18, United States Code, Section 1957(a), that is, did knowingly engage and attempt to engage in a monetary transaction affecting

interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, and knowing that the property involved in the monetary transaction was derived from some form of unlawful activity:

| Approx. Date of Transaction | Description of Monetary Transaction |
|---|---|
| 03/07/2025 | Wire transfer of approximately $71,500 from Account 1[1] to Foreign Entity 1[2] |
| 04/03/2025 | Wire transfer of approximately $44,850 from Account 3[3] to Foreign Entity 2 |
| 04/04/2025 | Wire transfer of approximately $84,240 from Account 2[4] to Foreign Entity 1 |

There further is probable cause to believe that the specified unlawful activity is health care fraud, in violation of Title 18, United States Code, Section 1347.

    4.    The information and statements contained in this affidavit are based upon my personal knowledge and investigation, as well as documents and information provided to me by other law enforcement personnel and witnesses. Since this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not

---

[1] "Account 1" is an account ending in x7605 and held in the name of ABRH Care, Inc. ("ABRH"), at Bank 1.

[2] Foreign Entities 1 and 2 are corporate entities controlled by unknown individuals and based in Hong Kong and China.

[3] "Account 3" is an account ending in x0145 and held in the name of ABRH at Bank 3.

[4] "Account 2" is an account ending in x5366 and held in the name of ABRH at Bank 2.

included each and every fact known to me concerning this investigation. All figures, times, and calculations set forth in this affidavit are approximate.

## **PROBABLE CAUSE**

### ***Summary of Criminal Conduct***

5.      The government's investigation has revealed that NAKASHIDZE owns and operates a durable medical equipment ("DME")[5] company, ABRH Care, Inc. ("ABRH"), that has fraudulently billed commercial insurers, Federal Employee Health Benefit Program ("FEHBP") insurers, and Medicare Part C insurers—also known as Medicare Advantage Organizations ("MAOs")—tens of millions of dollars for orthotic braces, continuous glucose monitors, and wound dressings that beneficiaries did not need and did not receive. NAKASHIDZE, who currently controls the bank accounts for ABRH, has conducted numerous transactions involving over $10,000 in the proceeds of this health care fraud, including wiring proceeds to foreign entities and moving money across the ABRH accounts.

6.      Analysis of ABRH's financial records confirm that at least $1.3 million in payments from commercial insurers, FEHBP insurers, and/or MAOs has been deposited by paper check into ABRH's accounts, over which NAKASHIDZE is the sole signatory. Bank surveillance photos show NAKASHIDZE depositing checks from insurers. The bank accounts reviewed to date contain no activity consistent with a legitimate medical business, such as payments to stock

---

[5] DME is equipment that is designed for repeated use and for a medical purpose, such as orthotic braces and continuous glucose monitors. As described herein, ABRH also billed for wound dressings, which include alginate dressings intended to absorb exudate from wounds and promote tissue regeneration.

medical products that ABRH supposedly provides to beneficiaries. Instead, the bank accounts show that NAKASHIDZE frequently transfers large sums of money between ABRH's accounts, to foreign entities, and to his personal account.

### Commercial Insurance

7.      Private insurers offer various individual and family insurance plans that cover medical costs such as DME and wound dressings in accordance with their policies and state and federal law, including requirements that such services be medically necessary.

### The Medicare Program

8.      The Medicare Program ("Medicare") is a federally funded health care program that provides free or below-cost health care benefits to individuals who are sixty-five years of age or older or disabled. The benefits available under Medicare are governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency CMS, oversees and administers Medicare. Individuals who receive benefits under Medicare are commonly referred to as "beneficiaries."

9.      Medicare is subdivided into multiple program "parts." Medicare Part A covers health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covers physician services and outpatient care, including an individual's access to DME and wound dressings. Medicare Part C provides beneficiaries with the option to receive their Medicare Part A and B benefits through MAOs. Health care providers that provide and supply items and services to beneficiaries, whether under Medicare Part A, B, or C, are referred to "providers."

4

10.     MAOs are required to provide Medicare beneficiaries with the same services and supplies offered under other Medicare plans. MAOs, including Blue Cross & Blue Shield ("BCBS"), Aetna Inc. ("Aetna"), Anthem Insurance Companies Inc. ("Anthem"), Cigna, Humana Inc. ("Humana"), Molina Healthcare Inc. ("Molina"), Meridian Health Plan of Illinois ("Meridian Illinois"), UnitedHealth Group Inc. ("UnitedHealthcare") and others, contract with CMS to provide managed care to Medicare beneficiaries through a variety of sponsored plans.

11.     To obtain payment for services or treatment provided to a beneficiary enrolled in an MAO sponsored plan, providers submit itemized claim forms to the MAO certifying that the contents of the form are true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing Medicare. The provider also certifies that the services being billed were medically necessary and were in fact provided as billed.

12.     A provider need not be enrolled with Medicare to submit claims to MAOs for services provided to Medicare beneficiaries and, if not enrolled, is considered a non-participating provider. Such a provider does not have to enroll with or enter an agreement with an MAO to bill that MAO. An unenrolled provider is treated as an out-of-network provider and does not have to disclose corporate information such as ownership information or banking information. In my training and experience, I am aware that some individuals committing health care fraud will avoid registering with Medicare Parts A and/or B due to the many disclosures necessary to enroll as a provider and bill those program parts.

### *The Federal Employee Program*

13.     The FEHBP is a federally funded health benefit program for federal employees, retirees, and their eligible spouses and dependent children. The U.S. Office of Personnel

5

Management ("OPM") administers the FEHBP. Payroll offices from all federal agencies collect health insurance premiums and forward the money to OPM's revolving trust account maintained at the U.S. Treasury. OPM contracts with numerous health insurance plans, including BCBS. These insurance plans process and pay health care claims on behalf of the FEHBP. OPM reimburses the contracted health insurance plans for 100% of the health care claims they pay, and 100% of their administrative expenses, plus a negotiated service charge.

14.     The FEHBP, commercial insurers, and MAOs are "health care benefit programs" as defined by 18 U.S.C. § 24(b).

### The Defendant and Relevant Entities

15.     NAKASHIDZE is a Georgian citizen and is believed to reside in Miami, Florida.

16.     ABRH is a DME company incorporated under the laws of Florida with its principal place of business located at 201 South Biscayne Blvd., Suite 2830, Miami, Florida 33131.

17.     Individual 1 is an employee of the company that manages the building occupied by ABRH. At present, Individual 1 is assigned to the floor occupied by ABRH.

18.     On or around December 2, 2024, ABRH was incorporated under the laws of Florida with Owner 1 listed as the sole officer and Director of ABRH.

19.     On or around January 10, 2025, Articles of Amendment were filed with the Florida Department of State removing Owner 1 from ABRH's registered officers and adding NAKASHIDZE as the sole officer and Director of ABRH. On or around February 19, 2025, an Annual Report was filed listing NAKASHIDZE as the President, Secretary, Treasurer, and Director of ABRH. Since January 10, 2025, NAKASHIDZE has been the sole registered manager or control person of ABRH.

6

20.     To bill Medicare or an MAO, a DME supplier is required to obtain a National Provider Identifier ("NPI") number through the National Plan and Provider Enumeration System ("NPPES"). Upon approval, the health care provider acquires a unique 10-digit NPI. After an NPI is provided, NPPES publishes certain parts of the NPI record to include the provider's name, specialty, taxonomy, and practice address.

21.     According to the NPPES NPI Registry, ABRH has an enumeration date of December 4, 2024, and shows an "Active" status with the NPI number of 1336955434. The record shows the president of the corporation is Owner 1, and the corporation's mailing address is 201 South Biscayne Blvd., Suite 2830, Miami, Florida 33131.

### The Underlying Health Care Fraud

*Beneficiary Complaints and Interviews*

22.     HHS-OIG has received multiple complaints and referrals from MAOs and their plan members regarding ABRH submitting claims for services not rendered.

23.     On or about April 17, 2025, ABRH billed Molina Healthcare of Michigan for various alginate wound dressings purportedly provided to Beneficiary 1. On May 27, 2025, law enforcement interviewed Beneficiary 1 and was told that s/he had no wounds on his/her arms, legs, or back. Beneficiary 1 reported that s/he has not gone to a doctor in a while and does not recognize the referring physician. Beneficiary 1 stated that s/he has not received any wound dressings from ABRH.

24.     On or about April 17, 2025, ARBH billed Molina Healthcare of Michigan for 540 units of alginate wound dressings, a left side knee brace, a right side knee brace, a left side wrist brace, a right side wrist brace, and a rigid back brace purportedly provided to Beneficiary 2. On

7

May 20, 2025, law enforcement interviewed Beneficiary 2 and was told someone ordered equipment for Beneficiary 2 without his/her authorization or knowledge. Beneficiary 2 stated that s/he did not need orthotic braces or wound dressings. Beneficiary 2 was not sure who ordered DME or why it was in his/her name. Beneficiary 2 reported the incident to Molina Healthcare.

25.     On or about March 7, 2025, ABRH billed Humana for 540 units of alginate wound dressings, a left side knee brace, a right side knee brace, a left side wrist brace, a right side wrist brace, and a rigid back brace purportedly provided to Beneficiary 3. On May 28, 2025, law enforcement interviewed Beneficiary 3. Beneficiary 3 stated that s/he does not suffer from wounds and has no diagnoses requiring orthotic braces or wound dressings. Beneficiary 3 further stated that s/he was not familiar with the provider who purportedly referred him/her to receive the orthotic braces and wound dressings, and was not familiar with ABRH.

26.     On or about April 21, 2025, ABRH billed Meridian Illinois for 240 units of alginate wound dressings, a left side knee brace, a right side knee brace, a left side wrist brace, a right side wrist brace, and a rigid back brace purportedly provided to Beneficiary 4. On May 27, 2025, and June 1, 2025, law enforcement interviewed Beneficiary 4. Beneficiary 4 told law enforcement that while s/he did have a wound, s/he had not received any wound dressings. Beneficiary 4 further stated that while s/he had received a wrist brace from one of his/her doctors in the past, it was received in person at the physician's office and not by mail from ABRH. Beneficiary 4 stated that s/he does not need braces for both knees, both wrists, or his/her back. Beneficiary 4 told law enforcement that s/he has visited a lot of doctors and does not recognize the name of the provider who purportedly referred him/her to receive braces and wound dressings from ABRH. Beneficiary 4 stated that s/he did not approve or authorize anyone to bill her Medicare Advantage plan for

8

wound dressings, and would not have authorized or approved anyone to bill her Medicare Advantage plan for braces s/he does not need.

27.     On or about February 18, 2025, ABRH billed BCBS for a left side knee brace, a right side knee brace, a left side wrist brace, a right side wrist brace, and a rigid back brace purportedly provided to Beneficiary 5. On May 30, 2025, law enforcement interviewed Beneficiary 5. Beneficiary 5 told law enforcement that s/he has no knee or wrist injuries and that s/he never ordered or received any orthotic braces, and is not familiar with ABRH.

*Physician and Medical Practice Interviews*

28.     Between on or about February 4, 2025, and on or about March 11, 2025, Anthem, in its capacity as an MAO, reported that it received claims for back, knee, and wrist braces and wound dressings purportedly prescribed to four Part C beneficiaries by Physician 1. Each of the four beneficiaries purportedly received a left side knee brace, a right side knee brace, a left side wrist brace, a right side wrist brace, a rigid back brace, and 540 units of alginate wound dressings. On May 28, 2025, law enforcement interviewed Physician 1, who told law enforcement that s/he has not prescribed or ordered any orthotic braces or wound dressings for any patients. Physician 1 stated that s/he is not familiar with alginate dressings. Physician 1 further stated that s/he does not know ABRH and would not refer a patient to a DME supply company in Miami, Florida, as s/he is based in Virginia. Physician 1 noted that s/he does not see patients on a national level and is not a telemedicine provider.

29.     Between on or about April 14, 2025, and on or about May 9, 2025, Humana, in its capacity as an MAO, reported that it received claims from ABRH for back, knee, and wrist braces purportedly prescribed to six Medicare Part C beneficiaries by Physician 2. Each of the six

beneficiaries purportedly received a left side knee brace, a right side knee brace, a left side wrist brace, a right side wrist brace, and a rigid back brace. On May 30, 2025, law enforcement interviewed a hospital administrator with access to Physician 2's patient files. The administrator confirmed that none of the six beneficiaries are current patients of Physician 2 and that none of them had been prescribed braces by Physician 2. The administrator further stated that s/he had never heard of ABRH and that it would be strange for any patients at the hospital where Physician 2 practices—which is located in California—to be billed for DME in Florida.

30.     Between on or about April 8, 2025, and on or about April 9, 2025, UnitedHealthcare, in its capacity as an MAO, reported that it received claims for back, knee, and wrist braces purportedly prescribed to three Medicare Part C beneficiaries by Physician 3. Each of these beneficiaries purportedly received a left side knee brace, a right side knee brace, a left side wrist brace, a right side wrist brace, and a rigid back brace. On May 30, 2025, a registered nurse that worked in the office of Physician 3 was interviewed and told law enforcement that these beneficiaries were not and have never been patients of Physician 3.

*Analysis of Claims Data*

31.     The billing data shows that ABRH began submitting large numbers of claims to MAOs on March 7, 2025, shortly after NAKASHIDZE became an owner and operator of ABRH. In total, MAOs have reported to CMS that from March 2025, through May 2025, ABRH submitted 24,755 claims to MAOs for approximately 3,644 beneficiaries. The MAO-reported billed amount

for these claims is $113,013,075, of which approximately $7,484,788 has been reported as paid.[6] The billing targeted specific products and billing codes, as described below.

32.     MAOs reported that ABRH submitted 24,755 claims for approximately 3,644 Medicare Part C beneficiaries between on or about March 7, 2025, and on or about May 30, 2025. There were approximately 18,160 claims submitted related to orthotic braces, approximately 6,545 claims related to wound dressings, and approximately 50 claims submitted related to continuous glucose monitors and other DME.

33.     During this period, ABRH submitted approximately 18,160 claims for approximately 3,630 beneficiaries across the United States relating to orthotic braces. These claims were submitted to MAOs including Aetna, Anthem, Humana, Molina, Meridian Illinois and UnitedHealthcare. MAOs reported that as a result of these claims, they were billed approximately $80,182,340 by ABRH, of which approximately $3,188,039 was reported as paid. Approximately 74% of the 18,160 claims were associated with providers who had no established relationship with the beneficiaries prior to purportedly referring them to receive an orthotic brace. In my training and experience, I know that it can be an indicator of fraud when patients receive services from providers with whom they have no prior relationship. Patients typically to seek out providers they already have a history with to provide medical services and make informed

---

[6] These numbers are approximate due to how MAOs report claims and payment data. MAOs submit their Medicare Part C claims data to CMS, which memorializes the services provided to the Medicare Part C beneficiaries but does not include official paid amounts for those services. MAOs are not required to submit billed or paid amounts for the reported claims. While some do provide this information, others elect to report no billed or paid amounts, or to report fee-for-service equivalent billed or paid amounts. CMS does not independently verify the amounts.

decisions about their care. All of these claims were submitted to insurers after NAKASHIDZE became Director of ABRH.

34.     During this period, ABRH also submitted approximately 6,545 claims for 3,256 beneficiaries across the United States relating to wound dressings. These claims were submitted to MAOs including Aetna, Anthem, Humana, Molina, Meridian Illinois and UnitedHealthcare. MAOs reported that as a result of these claims, they were billed approximately $32,675,925 by ABRH, of which approximately $4,296,230 was reported as paid. Approximately 78% of the 6,545 claims were associated with providers who had no established relationship with beneficiaries prior to referring them for wound dressing. All of these claims were submitted to insurers after NAKASHIDZE became Director of ABRH.

35.     Analysis of the billing data also shows that many Medicare Part C beneficiaries were billed for multiple different orthotic braces and wound dressings simultaneously. In total, of the 2,157 beneficiaries for whom ABRH submitted claims between on or about March 7, 2025, and on or about May 12, 2025, more than 88% were billed for at least one knee brace, one back brace, one wrist brace, and one wound dressing; often times, beneficiaries' plans were billed for multiple knee and wrist braces, in addition to the back brace and wound dressings.

36.     According to records provided by Aetna, between on or about February 14, 2025, and on or about March 29, 2025, Aetna—in its capacity as an MAO, FEHBP insurer, and commercial insurer—received claims from ABRH totaling approximately $10.5 million, of which

Aetna paid approximately $12,278.[7] Approximately $8.6 million of these claims were submitted to Aetna as a commercial insurer, of which Aetna paid approximately $4,090. As in the claims data reported by MAOs to CMS, the majority of the claims submitted to Aetna were for multiple orthotic braces and/or wound dressings provided to a single beneficiary.

*Interview of Individual 1*

37.     On June 2, 2025, Individual 1 was interviewed by law enforcement and stated that s/he works on the same floor as the ABRH suite. Individual 1 stated that s/he has seen two black females working inside ABRH's suite. Individual 1 did not recognize NAKASHIDZE when shown his photograph. Individual 1 stated that s/he receives mail for all tenants located on ABRH's floor. Individual 1 told law enforcement that ABRH receives a very large amount of mail from health insurers, such as Humana and UnitedHealthcare, and also receives mail addressed to NAKASHIDZE. Through my training and experience, I know when DME supply companies do not provide their electronic fund transfer information to insurers, insurers will mail payments to DME supply companies through paper checks. Individual 1 stated that the ABRH suite consists of a small, one-room office and is not a place customers would be able to visit. Individual 1 told Law Enforcement that the ABRH employees always work in the dark. Law enforcement walked by the ABRH suite and observed a black female inside of the suite, surrounded by mail, working with the lights off.

---

[7] These reported figures may also be included in the aggregated MAO billing data described herein.

*Evidence of Money Laundering*

38.     ABRH maintained accounts with at least four different banks between December 2024 and the present. The investigative team subpoenaed and analyzed ABRH's bank records.

39.     A review of ABRH's financial records obtained via grand jury subpoena did not reveal financial activity consistent with the running of a large-scale DME business. For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a durable medical equipment business, such as DME purchases, shipping and packaging fees, and/or storage fees. In fact, no such expenses appear on the accounts analyzed to date.

40.     On or about February 3, 2025, NAKASHIDZE opened Account 1 at a Bank 1 branch located in Miami-Dade County, Florida, in the name of ABRH. On the account opening paperwork, NAKASHIDZE identified himself as "Owner with Control of the Entity" and stated that he was the 100% owner of ABRH. Since this account was opened, NAKASHIDZE has remained the sole signatory on the account.

41.     On or about January 31, 2025, NAKASHIDZE opened Account 2 at a Bank 2 branch located in Miami-Dade County, Florida, in the name of ABRH. Since this account was opened, NAKASHIDZE has remained the sole signatory on the account.

42.     On or about February 12, 2025, NAKASHIDZE opened Account 3 at a Bank 3 branch located in Miami-Dade County, Florida, in the name of ABRH. On the account opening documentation, NAKASHIDZE reported that he was the control person and beneficial owner for ABRH, and the sole beneficial owner of the account. Since this account was opened, NAKASHIDZE has remained the sole signatory on the account.

43.     On or about March 14, 2025, NAKASHIDZE also opened a personal bank account ending in x9893 at a Bank 3 branch located in Miami-Dade County, Florida ("Account 4").

*Transactions Involving Account 1 and Account 2*

44.     In March 2025, the starting balance for Account 1 was approximately $162.87. Between on or about March 4, 2025, and on or about March 7, 2025, Account 1 received deposits of approximately $3,000 in cash and approximately $106,971.91 in paper checks from MAOs, FEHBP insurers, and/or private insurers, specifically, from BCBS, UMR, Cigna, and Aetna. No other deposits were made into Account 1 between March 1, 2025, and March 7, 2025. On or about March 7, 2025, approximately $71,500 was wired from Account 1 to Foreign Entity 1. This wire transfer is an example of a transaction of over $10,000 in fraud proceeds from Account 1.

45.     Also in March 2025, the starting balance for Account 2 was approximately $154.80. Between on or about March 10, 2025, and on or about March 25, 2025, Account 2 received deposits of approximately $7,152.61 via merchant bank card, and deposits of approximately $108,518.82 in paper checks from MAOs, FEHBP insurers, and/or private insurers, specifically UMR and BCBS. No other deposits were made into Account 2 between March 1, 2025, and April 4, 2025. On or about April 4, 2025, approximately $84,240 was wired from Account 2 to Foreign Entity 1. This wire transfer is an example of a transaction of over $10,000 in fraud proceeds from Account 2.

*Transactions Involving Account 3 and Account 4*

46.     In March 2025, the starting balance for Account 3 was approximately $100. Between on or about March 13, 2025, and on or about March 27, 2025, Account 3 received a deposit of approximately $0.01 from Square, Inc., and deposits of approximately $181,756.76 in

15

paper checks from MAOs, FEHBP insurers, and/or private insurers, including BCBS and SelectHealth. No other deposits were made between March 1, 2025, and April 3, 2025, when, as described below, NAKASHIDZE made an outgoing wire transfer to Foreign Entity 1.

47.     NAKASHIDZE was captured on bank surveillance when making at least one of these deposits of insurance proceeds into Account 3. According to records obtained from Bank 3, and as depicted in the surveillance footage below, on or about March 21, 2025, NAKASHIDZE entered a branch of Bank 3 located in Miami, Florida, and made an in-person deposit of paper checks to Account 3 totaling approximately $30,228.60. The two checks deposited by NAKASHIDZE were issued by BCBS to ABRH in the amounts of approximately $15,756 and $14,472.60.



Bank 3 - March 21, 2025 - 12:35 PM

16

48.     NAKASHIDZE was identified by comparison with the photo contained on his state-issued driver's license, as depicted below.



49.     On or about March 24, 2025, approximately $16,000 was transferred from Account 3 to Account 4, a personal account maintained by NAKASHIDZE, in two separate transactions of approximately $10,000 and approximately $6,000. On or about March 26, 2025, approximately $7,000 was also transferred electronically from Account 3 to Account 4. These transfers, together with the surveillance video capturing NAKASHIDZE'S in-person deposit of checks from insurers, are further evidence that NAKASHIDZE was in control of ABRH's accounts.

50.     On or about April 3, 2025, approximately $44,850 was wired from Account 3 to Foreign Entity 2. According to records obtained from Bank 3, this wire transfer was conducted in person at a branch of Bank 3 located in Miami, Florida. NAKASHIDZE was captured on surveillance video inside that branch on April 3, 2025, as depicted below. This wire transfer is an example of a transaction of over $10,000 in fraud proceeds from Account 3.

17



Bank 3 – April 3, 2025 – 11:50 AM

## **CONCLUSION**

51.     Based on the facts set forth above, I respectfully submit that probable cause exists to believe that, on or about the dates set forth below, in Miami-Dade County, in the Southern District of Florida, NAKASHIDZE committed money laundering in violation of 18 U.S.C. § 1957(a):

[remainder of page intentionally left blank]

18

| Approx. Date of Transaction | Description of Monetary Transaction |
|---|---|
| 03/07/2025 | Wire transfer of approximately $71,500 from Account 1 to Foreign Entity 1 |
| 04/03/2025 | Wire transfer of approximately $44,850 from Account 3 to Foreign Entity 2 |
| 04/04/2025 | Wire transfer of approximately $84,240 from Account 2 to Foreign Entity 1 |

**FURTHER AFFIANT SAYETH NAUGHT.**

ORLANDO BUISSERETH
SPECIAL AGENT
HEALTH AND HUMAN SERVICES
OFFICE OF THE INSPECTOR GENERAL

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this __4th__ day of June 2025.

HONORABLE ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

19